**FILED**

DEC 1 0 2020

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION**

FILE NO. 4:20-CV-230-FL

*Complaint*

DANIEL J. WILLIS
        Plaintiff,

V

JONES COUNTY BOARD OF ELECTIONS
              AND
NORTH CAROLINA STATE BOARD OF ELECTIONS, ET AL.
 AND/OR THEIR SUCCESSORS
           Defendants

### EQUAL PROTECTION CLAUSE
### AT-LARGE ELECTION METHODS
### VOTE DILUTION CLAIM—42 U.S.C. SECTION 10301

1. This is an at-large election [effort] methods action, brought under 42 U.S.C. Section 10301, where plaintiff, people of color and all others similarly situated voters, seek declaratory and injunction relief against the continued use of existing and enforced at-large election [effort] methods of denying the plaintiff and all others similarly situated, of electing their preferred candidates, and/or, representatives as aldermen to the Town of Trenton, North Carolina, and enforced by the Jones County Board of Elections, and the North Carolina State Board of Elections, on the grounds that it dilutes the strength of the plaintiff and African-American Voters, who has suffered disproportionately, and which is discriminatory whereas, plaintiff seek damages and is seeking to secure equitable relief under any act of Congress providing for protection of Civil Rights, "at least in theory."

2. Plaintiff bring this at-large election [effort] method action as it applies to the vote dilution complaint, which was the result of a systematic racial discrimination violation of plaintiff's constitutional rights and aside from the Fifteenth [15th] Amendment, which guarantees the equal right to vote as to enforce at-large elections [past and present], and without regard to race, color, or previous condition of servitude, where the basic federal prohibitions against discrimination in voting are (1) the Fourteenth [14th] Amendment, which prohibits intentional discrimination by public officials; (2) reconstruction – era statutes imposing civil and criminal penalties upon those who interfere with voting rights; and (3) the modern Voting Rights Act of 1957, 1960, 1964, and 1965 (amended), most important is the Voting Rights Act of 1965, requires federal approval of changes in voting discrimination that result in discrimination are unlawful

whether or not they were enacted or are being maintained with a racially discriminatory purpose was guaranteed nationwide, "at least in theory."

3.  Plaintiff files this Civil Rights Complaint against the defendants as to at-large elections and voter dilution, past and present, enforced in the Town of Trenton, Jones County, North Carolina, from its initial beginning, unto this very day, where they failed and refused to comply to the Fourteenth [14th] Amendment, where the amendment, in the words of the  Supreme Court, "nullifies sophisticated as well as simple minded modes of discrimination and makes unlawful "onerous" procedural requirements which effectively handicap exercise of the franchise by the Colored [minorities] race."

4.  Plaintiff alleged that while the Fifteenth [15th] Amendment was enacted as a limitation on public officials [defendants herein] the acts of private individuals have been held in, past and present, unconstitutional under it where they perpetuated or acted as a substitute for official discrimination, "at least in theory."

5.  This complaint, filed by the undersigned, ask this court to make clear how it takes advantage of the laws designed to secure the rights of the plaintiff, racial minorities, people of color, and all others similarly situated.  Individual paragraphs, herein, explain the federal civil laws and procedures protecting the rights of the plaintiff, racial minorities, people of color, and all others similarly situated in voting, as to at-large elections, education, housing, public accommodations, federally assisted programs, and jury selection and trials, and the use of race-conscious remedies, and to ensure equality and eradicate the continuing effects of past and present discrimination accumulated in the at-large elections and vote dilution, where the challenge to the plaintiff, racial minorities, people of color, and all others similarly situated remains to bring reality to the declared principle that "all persons are created equal," at least in theory.

6.  Plaintiff alleges that the defendants' disfranchising the plaintiff, was "to take from [the ignorant Blacks] every ballot that the defendants under conspiracy, and acting under color of laws, of our national government."  One generally adopted method of excluding the plaintiff, racial minorities, people of color, and all others similarly situated from voting was to impose a literacy test. Typically, the test required the voter [Whites only] to be able to read and write a portion of the Constitution as a condition to register to vote.  The literacy test was racially neutral on its face, but it was administered in a way that excluded minorities, people of color, and all others similarly situated residents, "at least in theory."

7.  Plaintiff alleges that in 1982 Congress amended the Voting Rights Act to provide that a violation of Section 2 of the act, as opposed to the Constitution, could be established by

showing either the discriminatory purpose or result of a challenged practice. The "right question" was whether minorities had an equal opportunity and due process to participate in the political process and elect preferred candidates [representatives] of their choice. As in any case involving a constitutional violation, such as, at-large election [effort] method, plaintiff is asking this court to be obligated to exercise its equitable powers so that it fully and completely remedies the dilution of minority voting strength, and the at-large election method now being enforced.

8. The basic provisions of the Voting Rights Act of 1965, as amended in 1970, 1975, 1982, 1992, and the at-large election [effort] method, abolished tests or devices for voting which had been used in the past to disfranchise racial minorities. Section 2 of the act, which was amended to 42 U.S.C. Section 10301, provides that voting practices are unlawful if they result in discrimination, whether or not they were enacted or are being maintained with a discriminatory purpose and basic provisions and amendments of the Voting Rights Act of 1965 have been held to be constitutional by the Supreme Court.

9. Plaintiff alleges that a few African-American Voters, but no White Voters, constituted a discrimination against African-Americans in violation of the Due Process and Equal Protection Clause of the Fifteenth [15th] Amendment and denied the African-Americans the right to vote and elect a preferred candidate of their choice, in defiance of the Fourteenth [14th] and Fifteenth [15th] Amendments established that the African-American Citizens were "not" equally served, as Whites, and boundaries were "not" an ordinary geographic redistricting measure even within familiar abuse of gerrymandering and that the legislation was, solely, concerned with segregating the pro se plaintiff, people of color and all others similarly situated the African-American and White Citizens by fencing out African-Americans of their pre-existing municipal vote. See, Exhibits appended hereto.

10. Plaintiff alleges that at this stage of the litigation the court should "not" be concerned with the truth of the litigations, that is, the ability of the plaintiff, people of color and all others similarly situated, to sustain their allegations entitle the defendants to make good on their claim for the plaintiff, herein, are being denied rights under the at-large election method [effort] and "not" 10301, and the United States Constitution, namely, voting which states that the defendants, the Jones County Board of Elections, North Carolina State Board of Elections have an unconstitutional, racially selective long, long history of discrimination and plaintiff ask this court to overturn the at-large election method [effort] of voting where this appeal has become more subtle in form and furtive in their dissemination "but they persist to this time." See, Exhibits appended hereto.

11. Here, plaintiff alleges that "the constitutional validity the Voting Rights Act is not undermined by advances in voting equality since 1965." This is a case that needs to be presented to a jury. The demands of the plaintiff are in direct contravention and violation of the prohibition against voting schemes, at-large election method, designed to effect racially proportional representation. Given the extensive record before it of continued discrimination in voting, Congress concluded with near unanimity that the extension of Section 5 of the Voting Rights Act was necessary "to ensure that the right of all citizens, pro se plaintiff, people of color and all others similarly situated to vote, including the right to register to vote and cast meaningful votes for their preferred candidates [representatives] of choice, "is preserved and protected as guaranteed by the Constitution." See, 120 Stat. 577, Sec. 2(a).

12. The right to vote is "a fundamental right, because preservative of all rights." See, Yick Wo V Hopkins, 118 U.S. 356, 370 (1886). The considered judgment of Congress that this fundamental right should continue to be protected by Section 5 and Section 10301 is supported by the legislative record and is entitled to deference by this court and provides that voting practices that result in discrimination [at-large election method [effort] are unlawful whether or not they were enacted or being maintained with a racially discriminatory purpose,

13. Wherefore, it is often asked, "how do at-large elections dilute minority voting strength??" when voting is at-large, now being enforced, all the votes in a jurisdiction, political sub-division, or district elect all the officials, and/or, aldermen. The majority, if it votes as a bloc, can choose all the town's aldermen [officeholders], thereby depriving a discrete minority of an effective opportunity to elect any preferred candidates or representatives of its choice. At-large elections are a "winner take all" system that favors the numerical majority. Therefore, plaintiff asks the court to overturn the at-large election method now being enforced. An election at-large is an election in which a public official is selected from a major election district rather than a minor sub-division within the larger unit.

14. As in any case involving a constitutional violation, plaintiff, once more and again, ask this court to be obligated and to exercise its equitable power so that it fully and completely remedies the dilution of the pro se plaintiff, people of color and all others similarly situated minority voting strength. Remedies for violations in voting cases, such as this one, [and many, many others] include court orders ending the discrimination, retroactive relief such as the setting aside of elections in 2020, the establishment of new election procedures, and awards of attorney's fees and damages.

15. WHEREFORE, plaintiff prays on the court to take jurisdiction of this case and advance the cause on the docket and order a speedy hearing of this action after such a hearing enter an order for defendants to use Section 2 of the Voting Rights Act of 1965, and Section 10301, instead of the at-large election [effort] method.

16. Rule that the at-large election, now being enforced, has the purpose or effect of denying or abridging the right to vote on account of race, or color, also plaintiff asks this court to view, and/or, review [not cursory] the exhibits and Cases # 4:10-MC-1, 4:10-MC-2, 4:10-MC-4 and 4:13-MC-4-H, filed in this district court and without the court never, ever responding to the at-large election [effort] method now being enforced.

17. Plaintiff alleges that Congress did not specify any particular remedies for violations of Section 2.  Instead, it said a court has the duty to fashion relief so that it completely remedies the dilution of minority voting strength and fully provides an equal opportunity for minorities to participate and elect candidates of their choice.  Here, the minority population maybe so dispersed that it is impossible [so I think] to construct districts in which the minorities are a majority of the population.  Under the circumstances, other election procedures [I hope], such as limited or cumulative voting, may provide a more complete and full remedy for the vote dilution.

18. Plaintiff asks that the Amendment of Section 2 to accelerate the pace of voting rights litigation.  Hopefully, it has brought about a general decline in at-large elections and an increase use of district voting, which the plaintiff, African-Americans, people of color, and all others similarly situated citizens need in the Town of Trenton, North Carolina for at-large elections are unconstitutional, and is used in the Town of Trenton, North Carolina, and where district voting in turn, past and present, have facilitated minority political participation and office holding.

19. Also, plaintiff alleges that the Amendment of Section 2, where Congress concluded that racial polarization was, and is, unfortunately already an existing fact of political life.  The social science studies [as believed], has shown that the increase in minority office holding brought about by future district voting will be associated with an increase in responsiveness to minority interests and its inclusion of minorities in decision making. The presence of minority elected officials, plaintiff believes, will tend to break down polarization and racial stereotyping, last but not least, "at-large election methods," and has consistently withstood constitutional challenges.

20. There has never, and/or, ever been a person of color on the Trenton Town Board, as an alderman or representative of choice, where Section 2 applies to any and all practices that affects voting, and that includes electoral structures such as at-large election

methods, now being enforced from its "original beginning unto this very day," and the factors include racial bloc.

21. Here, <u>Rosebon v Garrson</u>, 528 F 2d 309 (4th Cir. 1975), the Appeals Court <u>would</u>, <u>could</u>, and <u>should</u> hold that a district court must advise a pro se litigant [except in Trenton, Jones County, North Carolina] of his rights under the summary judgment rule to file opposing affidavits to defeat a defendant's [or court's] motion for summary judgment involving at-large elections, the courts have generally ordered single member districts as a remedy. Plaintiff is asking for damages in the amount of $15,000,000.00 and to secure equitable relief under any act of Congress providing for protection of Civil Rights. Here, an uncleared change has "not" been implemented, the court must enjoin the at-large election and its further use and fashion a remedy to undo the harm caused by the failure to comply.

22. Plaintiff asks the court to shorten the terms of office of those elected under an at-large election and order new elections under the preexisting plan. Plaintiff alleges that an at-large election system is one in which all voters can vote for all candidates running for open seats in the jurisdiction. In an at-large election system candidates run in an entire jurisdiction rather than from districts or wards within the area. For example, a city with three [3] open city council positions where all candidates for the three [3] seats run against each other and the top three [3] receiving the most votes city wide are elected is an at-large election system. In at-large election systems, 50% of the voters' control 100% of the seats. At-large election systems can have discriminatory effects on minorities where minority and majority voters consistently prefer different candidates and the majority will regularly defeat the choices of minority voters because of their numerical superiority.

23. Although, minority vote dilution occurs in each and every election when minority voters are deprived of an equal opportunity to elect a candidate of choice. It is prohibited under the Voting Rights Act of 1965. Examples of minority vote dilution includes, any and all, discriminatory effects of at-large election systems, whereas, the present Trenton, Jones County, North Carolina, Town Board in its present beginning, with three [3] members as Town Aldermen, without <u>never</u>, <u>ever</u>, changing from its present condition, and where the dual status exists, based on at-large election systems for voting which was used to disfranchise racial minorities, where Congress amended the Voting Rights Act in 1982, Congress provided that a violation of Section 2 could be established by showing either the discriminatory purpose or the discriminatory result of a challenged practice. The Voting Rights Act of 1965 abolished tests or devices for voting which were used, then and now, to disfranchise racial minorities.

24. Plaintiff alleges as a general matter, any remedies are available for constitutional violations and must be full and complete. The scope of the remedy will thus depend upon the nature and extent of the violation. Remedies for violations in at-large voting cases include court orders ending the discrimination; the establishment of new election procedures, and where plaintiff is seeking $15,000,000.00 in damages and to secure equitable relief under any act of Congress providing for Civil Rights, and awards attorneys' fees, court costs, and any other damages the court thinks is fair.

25. Plaintiff asks the court for a plan that would be narrowly tailored if it made no more use of race than was necessary and did not dilute the voting strength of minority voters, and where the defendant's at-large election lies to be enforced, will continue, where the Equal Protection Clause of the Fourteenth [14th] Amendment prohibits the dilution of minority voting strength, as herein. Plaintiff further states that to prove a constitutional violation, plaintiff did show that a voting practice was adopted in the Town of Trenton's beginning, unto this present time, or is being maintained with a racially discriminatory purpose, namely, no sidewalks, curbs, gutters or storm drainages in minority neighborhoods, or minorities never, ever elected to the Trenton Town Board as Aldermen, or their communities annexed in their entirety; and where the defendants may issue their last line of defense.

26. Plaintiff states that the inevitable result of at-large elections, Jim Crow, and racial discrimination was injustice, bitterness, and violence, and where the forces for racial change in the Town of Trenton, Jones County, North Carolina, were never, ever, "entirely stilled," and where the plaintiff request the court to afford pleader a reasonable opportunity to articulate his cause of action. Plaintiff seek to secure damages of $15,000,000.00 and to secure equitable relief under any act of Congress providing for protection of Civil Rights, which could spark a constitutional crisis, and where "voter suppression" will cause a riot.

27. Plaintiff alleges that other voting procedures that lessen the opportunity of Black Voters to elect preferred candidates of choice, in addition to the numbered seat requirement and the anti-single shot provisions of state law [at-large elections] held in Trenton [Jones County] were declared constitutional from the beginning, unto this present time, North Carolina has, since 1915, had a majority vote requirement which applies to all primary elections, but not to general elections. N.C.G.S. Section 163 – 111. This generally adverse effect on any cohesive voting minority is, of course, enhanced for racial minority groups if, as pro litigant found to be the fact in these case[s], where racial polarization in voting patterns also exists.

28. While no Black Candidate for election to the North Carolina General Assembly – either in the challenged districts or else, where – has so far lost (or failed to win) an election, simply and solely, because of the majority vote requirement nevertheless exists as a continuing practical impediment to the opportunity of Black Voting Minorities in the challenged districts to elect their preferred candidates of their choice.

29. Plaintiff alleges that such orders and decrees consistent with the opinion of the United States Supreme Court as is necessary and proper to admit the parties to this case to at-large elections and vote denials on a racially nondiscriminatory basis with all deliberate speed. Plaintiff further alleges that the election boards' authorities do have the primary responsibility for elucidating, assessing and solving the problem of present at-large elections, and vote [denial] dilutions, varied these problems, which may require solution in fully implementing the governing constitutional principles, "where the plaintiff shall be deemed to have exhausted his administrative remedies." See, 5 U.S.C. Section 552 (a) (6) (c) (i).

30. Plaintiff alleges that the at-large election [effort] method and voter dilution acts have been determined by the defendants, past and present, who should have viewed, and/or, reviewed, [not cursory] their acts as improper actions that infringes on a fundamental right. Plaintiff asserts that this case presents an important question of equal formalities as to the at-large lections method, and of procedure of a specific court ruling, where the defendants, failed and refused to respond, simply and solely, because they "all" are from the "White" race, and their word is law – not – the courts.

31. However, Section 2 claimants are not required to demonstrate by direct evidence a causal nexus between their relatively depressed socio – economic status and a lessening of their opportunity to participate effectively in the political process. See, S. Rep. No. 97 – 417, Supra Note 10 at 29 n. 114. Under incorporated White v Regester jurisprudence, "[i]regularity of access is an inference which flows from the existence of economic and educational inequalities." See, Kirksey v Board of Supervisors, 554 F 2d 139, 145, (5th Cir), cert denied, 434 U.S. 968, 98 S Ct 512, 54 L Ed 2d 454 (1977). Independently of any such general presumption incorporated in amended Section 2, pro se litigant would readily draw the inference from the evidence in these cases.

32. The defendants, herein, and altogether, while in conspiracy, and acting under color of law, as to at-large election [effort] methods, and vote dilution claims, past and present, in the Town of Trenton, and minority neighborhoods, "could not have position themselves more poorly."

33. Plaintiff alleges that pro se litigant alleges that "he is therefore entitled ...... to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf, and finally to be given the benefit of all favorable legal theories invoked by evidence so considered. See, Exhibits appended hereto.

34. Wherefore, plaintiff requests this court to overturn the enforced at-large elections, vote dilutions, past and present, unto this very day. Plaintiff alleges that in this present matter, now being enforced, and to give strength to, by adding their forces, emphasis or impressiveness to gain by force or compulsion, and to put in execution, and capable of being enforced by the at-large election method and vote dilution by the defendants, herein, where plaintiff request the court to find segregation of inequality [denial of equal protection and due process], and positive acts of exacerbation, and aggravation in the "Denial of Due Process and Equal Protection Clauses" that have been found to be unconstitutional, and the court is requested to view, and/or, review [not cursory] the favorable evidence where the plaintiff, minorities, people of color, and all others similarly situated that were submitted contemporaneously with the events at issue.

35. Plaintiff states that the events, now being enforced, denied the plaintiff, minorities, people of color, and all others similarly situated the ability to present and consider any evidence of extenuation or mitigation that may have been created contemporaneously and such an error must insure the benefits of the minorities, "as in law," and that containing percepts for the regulations of conduct, as to the "Equal Protection and Due Process Clauses," now being used, which demonstrates that racial minorities could, would, and should remain politically vulnerable, warranting the continued protection of the Fifth [5th], Fourteenth [14th], and Fifteenth [15th] Amendments of the "Due Process" and "Equal Protection Clauses" of the United States Constitution. Whereas, the Supreme Court has stated that wealth as well as race renders a classification highly suspect and thus demanding of a more exacting judicial scrutiny See, McDonald v Board of Elections Commissioner of Chicago, 394 U.S. 802, 807, 89 S Ct 1404, 221 Ed 2d 739 (1969).

36. The Jones County Board of Elections, along with the enforcement of the North Carolina State Board of Elections, altogether, while in conspiracy, and acting under color of law, had intentionally and officially enforced the at-large election methods, and vote dilutions, past and present, which were effectively discriminated, herein, as a continued discrimination against the plaintiff, minorities, people of color, and all others similarly situated in matters touching their exercise of the "at-large election methods and vote dilutions franchises," roughly several generations ago, until this present moment, where the long, long history of the Jones County Board of Elections, and the North Carolina

State Board of Elections, where the defendants, altogether, since the beginning of the at-large elections method and the vote dilution era or where the powers from exceeding their jurisdiction in matters over which they have cognizance or usurping matters not within their jurisdiction to hear or to participate effectively in the at-large election method and the vote dilution process, where the Supreme Court has stated [once more and again] that wealth as well as race renders a classification highly suspect and thus demanding of a more exacting judicial scrutiny fought with racial animosities that linger in diminished, but still evident form to the present, and that remain centered upon the "at-large election methods and vote dilutions," simply and solely, because of wealth and race and where the defendants have taken "no" action [what so ever] to satisfy the legal requirements of the Fifth [5th], Fourteenth [14th], and Fifteenth [15th] Amendment rights, as to the "Equal Protection and Due Process Clauses."

37. Section 5 of the Voting Rights Act of 1965, 79 Stat 439, provides that whenever a state or political subdivision covered by the act shall enact or seek to administer "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect [namely], Section 2 of the Voting Rights Act of 1965, 42 U.S.C. Section 10301, and no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard practice, or procedure "if the state or subdivision has not first obtained a declaratory judgment in the United States District Court for the Eastern District of North Carolina that such qualification, prerequisite, standard, practice, or procedure "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color," or unless some appropriate official of the State of North Carolina or subdivision has submitted the qualification, prerequisite, standard, practice, or procedure to the Attorney General has not interposed an objection within sixty [60] days after such submission."

38. Plaintiff alleges that Section 5 precludes a state or political subdivision or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, "without first submitting the change to the U. S. Attorney General securing a declaratory judgment from the District Court for the Eastern District of North Carolina that the change does not have a racially discriminatory purpose [at-large election] or effect.

39. Plaintiff alleges that the Town of Trenton, which is covered by the act, did enforce changes from ward to at-large election of aldermen. Though at-large election of aldermen was called for by a 1962 North Carolina Statute, the 1965 Trenton election was by wards. Further, since such changes, as to at-large election, may affect one's ability to vote and may have a racially discriminatory purpose or effect and the change from ward to at-large election of aldermen comes within the purview of Section 5 since the procedure in fact "in force or effect" on November 1, 1964, was the election of aldermen by wards.

40. This is not to say that a District Court limited to deciding a "coverage" question should close its eyes to the congressional purpose in enacting Section 5 to prevent the institution of changes which might have the purpose or effect of denying or abridging the right to vote on account of race or color, for Congress meant to reach "the subtle, as well as the obvious, state regulations" which may have that effect.

41. Plaintiff alleges that what is foreclosed to such District Court is what Congress expressly reserved for consideration by the District Court for the District of North Carolina, Eastern Division or the Attorney General and the determination whether a covered change [such as at-large election method] does or does not have the purpose or effect "of denying or abridging the right to vote on account of race or color," which denied plaintiffs the right to choose their preferred candidates [unto this very day].

42. The challenged change [from at-large election – to – Section 2 of the Voting Rights Act of 1965, 42 U.S.C. Section 10301] would, could, and should be examined on the merits to determine whether they had "a discriminatory purpose or effect." This should emerge with particular clarity in the District Court's consideration. Similarly, in considering the change from ward to at-large election of aldermen, as provided by a North Carolina Statute and where it is alleged that "since many of the voters are African-American in Trenton and it is equally true that under the said act [statute] the African-American Voters have the power if they wish to be influenced by race alone and to elect an all Black Governing Body," where plaintiffs ask for at least two [2] seats in the aldermen.

43. Congress intended that the act be given "the broadest possible scope "to reach" any state enactment which altered the election law of a covered state in even a minor way." "It is significant that Congress chose not to include even ...... minor exception, thus, indicating an intention that all changes, no mater how small, be subjected to Section 5 scrutiny." The court should challenge in this case falls within Section 5, if not as a "voting qualification or prerequisite to voting," at all events as a "standard, practice, or procedure with respect to voting different from that in force or effect in the Town of Trenton's last election. Here, gerrymandering had become a prime weapon for discriminating against African-American Voters.

44. In Fairly v Patterson, (1969), a companion case to Allen, they should hold that Section 5 applied to a change from district to at-large election method of county supervisors on the ground that "[t]he right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot." See, Reynolds v Sims, 377 U S 533, 555 (1964).

45. The opinion in this case will be accurately recognized that this court's holding rested on the conclusion that "Congress intended to adopt the concept of voting articulated in Raynolds v Sims, 377 U S 533 (1964), and protect African-Americans against a dilution of their voting power." Fairly v Patterson, supra, at 588. In terms of dilution of voting power, there is no difference between a change from district to at-large election method and that changes in the ward lines of a town like Trenton to include more voters. We ask the court to follow Fairley and hold that Section 5 applies in this case.

46. The court is asked to conclude, rule and hold, nevertheless, that the change to at-large elections method required federal scrutiny under Section 5. That section in express terms reaches any standard, practice, or procedure "different from that in force or effect on November 1, 1964. "In my view, and/or, review [not cursory] Section 5's reference to the procedure on November 1, 1964," must be taken to mean the procedure that could, should, and would have been followed if the election had been held that date.

47. It is argued that judgment is necessarily a matter of inference in this case "if" the defendants do not hold an at-large election but in drawing that inference, there is little reason to blind ourselves to relevant evidence in the record by restricting our gaze to events that occurred before that date. Ordinarily plaintiffs presume that officials will act in accordance with law. See, First National Bank of Albuquerque v Albright, 208 U S 548, 553 (1908).

48. Consequently, plaintiffs conclude that the procedure in fact "in force or effect" in Trenton, North Carolina, on November 1, 1964, was to elect all White Aldermen by wards. That sufficed to bring the 1969 change within Section 5. As was the case in Al'en, "it is clear, however, that the new procedure with respect to voting is different from the procedure in effect when Trenton became subject to the act." The bearing of the 1962 statute upon the change was for the Attorney General or the District Court for the Eastern District of North Carolina to decide.

49. Therefore, the plaintiffs will continue to urge that, in addition to issuing a judgment, the court should set aside the elections and order new elections held forthwith in which the changes challenged in this case may not be enforced. In arguing for new elections, plaintiffs emphasize the desire of Congress to ensure that states and subdivisions covered by the act not institute new laws with respect to voting that might have a racially discriminatory purpose or effect on the basis of the legislative history, there is little question that Congress sought to achieve this goal by relying upon the voluntary submission by affected states and subdivisions of all changes in such laws before

enforcing them.

50. Plaintiff alleges that failure of the affected governments to comply with the statutory requirement could, should, and would nullify the entire scheme since the Department of Justice does not have the resources to police effectively all the states and subdivisions covered by the act, See, Allen, 393 U S at 556, and since private suits seem unlikely to sufficiently supplement federal supervision. Moreover, based upon ample proof of repeated evasion of court decrees and of extended litigation designed to delay the implementation of federal constitutional rights, Congress expressly indicated its intention that the states and subdivisions, rather than citizens seeking to exercise their rights, bear the burden of delays in litigation.

51. We ask that you show a good faith effort by these currently responsible state agencies, and to directly reverse official state policies which persisted for more than seventy [70] years into this century, is demonstrably now producing some of its intended results. If continued on a sustained basis over a sufficient period, the at-large election method [effort] might succeed in removing the disparity in registration which survives as a legacy of the long period of direct denial and chilling by the state of registration by the plaintiff, people of color and all others similarly situated.

52. But at the present time the gap [at-large elections] has not been closed, and there is of course no guarantee that the effort will be continued past the end of your federal employment. In consequence of a long, long history, without alleviation in any degree, of racial discrimination in public and private facility uses, education, employment, housing and health care. Plaintiff, people of color and all others similarly situated registered voters of the Town of Trenton, North Carolina, remain hindered, relative to the White Majority, in their ability to participate effectively in the at-large election [effort] political process. The defendants have no constitutional rights or reasons to enforce the at-large election methods, past and present, which is contrary to law.

53. The defendants, herein, "have acted with ferocious spotty results," and have allegedly acted in conspiracy, and under color of law to wrongfully enforce the at-large election [effort] method and vote dilution as to deprive minorities of their pre-existing rights as to Equal Protection Clause and vote dilution, and the prevention and redress of wrongs, and were enacted or being maintained with a racially discriminatory purpose.

### WE ARE NOT HERE TO CURSE THE DARKNESS BUT TO LIGHT A CANDLE

Respectfully,

Daniel J. Willis
105 Cherry Street
Trenton, N.C. 28585
(252)448-6091
e-mail: danj5997@gmail.com
Pro Se Litigant