IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

FILE NO. 4:20-CV-230-FL

DANIEL J. WILLIS
        Plaintiff

V

JONES COUNTY BOARD OF ELECTIONS, ET AL
AND/OR THEIR SUCCESSORS
        Defendants

FILED

'JAN 0 5 2021

PETER A. MOORE, JR., CLERK
  US DISTRICT COURT, EDNC
BY_____ DEP CLK

## CORRECTIVE DOCUMENT
## PARAGRAPHS 2 – 12 – AND 22

## AMENDED COMPLAINT

1. This is an action to enforce Section 2 of the Voting Rights Act of 1965, 42 U.S.C. Section 10301, as to at-large [effect] methods of election, where plaintiff seeks declaratory and injunctive relief against continued use of the existing at-large [effect] method of electing their preferred candidates as Town Aldermen, and federal representatives on the grounds that it dilutes the voting strength of the plaintiff, minorities, people of color, and all others similarly situated voters.

2. The voting right actions language, structure, and legislative of the long, long history make clear that a state [North Carolina] that assigns voter – registration duties for federal elections to its local election authorities would, could, and should be, liable if those local officials that violate Section 2 of the Voting Rights Action, again, defendants, Jones County Board of Elections, and the North Carolina State Board of Elections are the proper defendants in this case.

3. The existing [enforced] at-large method of electing plaintiff's preferred candidates has the results and effects of denying or abridging the right of plaintiff, and all others similarly situated [African-Americans], to vote on account of race or color in violation of plaintiff's rights guaranteed by Section 2 of the Voting Rights Act, 42 U.S.C.A. Section 10301.

4. The District Court <u>would</u>, <u>could</u>, and <u>should</u> correctly weigh the issue of causation in its totality analysis and <u>should</u> properly find that racially polarized voting patterns in the Town of Trenton, North Carolina, and where the Jones County Board of Elections and the North Carolina State Board of Elections can not be explained by partisanship, altogether, while in conspiracy and acting under color of law, and the at-large voting scheme violates Section 2 of the Voting Rights Act, and the Court of Appeals have rejected similar constitutional challenges to Section 2 of the Voting Rights Act, whereas, Section 2 is a valid exercise of Congress' constitutional authority to enforce the Fourteenth [14th] and Fifteenth [15th] Amendments. Whereas, the court <u>should</u> give appropriate weight to Town of Trenton's at-large [effect] election methods, past and present, which, were held at-large.

5. The town's at-large [effect] methods of electing the Town Council, and to its Mayor, violates Section 2 <u>"and" Section 2 does not require plaintiff to produce evidence of intentional intended "discrimination."</u> Section 2 of the Voting Rights Act is appropriate enforcement legislation under the Fourteenth [14th] and Fifteenth [15th] Amendments to the United States Constitution. Plaintiff is challenging, in its entirety, the District Court's finding of no liability of the Jones County Board of Elections, and the North Carolina State Board of Elections, who are proper defendants in this case, and the District Court abused its discretion in excluding the said parties as defendants.

6. Plaintiff respectfully request the court to vigorously debate this issue to a constitutional, voting and Civil Rights end. Given the remedy and facts [where evidence was required] of this case, plaintiff is entitled to relief. Section 2 was designed to provide a comprehensive constitutional and statutory rights. Thus, allegations far less specific and entitled to relief. Plaintiff filed this action to obtain a change in the Town of Trenton and the Board of Elections, et al election procedures and to remove all election barriers in voting, which has a purpose to limit plaintiff's political participation and plaintiff seeks $15,000,000, in damages and to secure equitable relief under any act of Congress providing for protection of Civil Rights. Voting in Trenton is racially polarized, and because of the at-large [effect] method of elections and polarized voting plaintiff and other minorities have been discouraged from running for the Town Council, and its Mayor, plaintiff and other minorities have less opportunity than Whites to vote and elect their preferred candidates of choice.

7. The Town Council, and its Mayor, as to the Town of Trenton, consists of three [3] Town Aldermen [Council Members], and one [1] Mayor, from its beginning, unto this day, and all are elected at-large elections, and all have been, and are White. Plaintiff alleges that Section 2 does not on its face provide a private right of action, nor does it say who may sue to enforce the statute. The court has held, however, that "although Section 2......provides no rights to sue on its face, the existence of the private right of action

under Section 2......has been clearly intentionally intended by Congress since 1965."
See, <u>Morse v Republican Party of Virginia</u>, 517 U S 186, 232 [1996]. Similarly, Section 2,
while it defines conduct that is unlawful for a state or political subdivision to engage in,
does not specify who might be a proper defendant. Such a determination is made by
reference to state and federal law [however, Section 1983 includes the Town Council,
and their representative capacities as well as their individual capacities within the
meaning of 'person' as the term is used in Section 1983 for purposes of the equitable
relief sought here].

8.  The language of Voting Rights Act as to the defendants, herein, are subject to Voting
    Rights Act liability. For example, those who deprive persons of rights secured by Section
    1978 or interfere with any right secured by Section 1973 are subject to criminal
    prosecution, fines, and imprisonment. See, <u>42 U.S.C. Section 10301</u>. Only individuals,
    not political subdivisions, can be imprisoned. If Congress meant to exclude individuals
    from liability for violation of Section 2, it would not have provided a penalty of
    confinement for those who deprive persons of color of rights protected by the statute.
    Plaintiff has less opportunity than Whites to participate in the political process and to
    elect preferred candidates of his choice.

9.  The members of the Town Council, its Mayor, and the Jones County Board of Elections
    who are elected and holding office under a system alleged to violate Section 2, are
    proper parties regard to their expose to fees and costs. The pro se litigant [plaintiff
    herein]. Pro se litigant and all others who were alleged that he and all others who were
    unconstitutionally diluted on the basis of race, color, and national gender, and were
    adopted purposefully to  discriminate which caused an inequality in the opportunities
    enjoyed by White Voters to elect their preferred candidates, and where all African-
    American Voters were impaired and diluted through the use of at-large [effect] method
    of elections in violation of Section 2 of the Voting Rights Act of 1964, 1965, 42 U.S.C.
    Section 10301, 1983, 1986. Title 28 Sections 1331, 1343 (3) and (4), and Title 42 U.S.C.
    Section 2000B (a), to enforce rights, and/or, political rights, guaranteed to the plaintiff,
    and all others similarly situated citizens by the Equal Protection Clause of the
    Fourteenth [14th] and Fifteen [15th] Amendments to the United States Constitution, and
    42 U.S.C. Section 1971.

10. Plaintiff alleges that the federal law [Voting Rights Act] which guarantees the right to
    citizens to vote and elect their "preferred candidates of choice," from the beginning of
    this voting denial era, unto this very day, without discrimination based on race, color or
    previous condition of servitude. The Attorney General is authorized to file proper
    proceedings for preventive relief to protect this right. See, 42 U.S.C.A. Section 1971 et
    seq., also, <u>City of Rome v United States</u>, 446 U S 156, 100 S Ct 1548, 64 L Ed 2d 119, and
    42 Section 1983 and Section 10301, where the world is watching the Attorney General's
    office to see what the Attorney General[s] can and will do.

11. Plaintiff alleges that the most dramatic breakthrough in racial reform came in 1954 in Brown v Board of Education, Order, which involved state laws requiring racial segregation in public schools, including its facilities and programs.  The court held that separate educational facilities and programs were "inherently unequal," and that Jim Crow schools [facilities and programs] deprived Blacks of "equal protection guaranteed by the Fourteenth [14ᵗʰ] Amendment."  The decade following Brown, where the defendants, altogether, while in conspiracy and acting under color of law, "failed and refused" to comply.

12. Pro se plaintiff filed this complaint under Article II, Section 6 and 7 and Article VI of the Constitution of the State of North Carolina and, whereas, plaintiff and all others similarly situated do seek damages in the amount of $15,000,000.00 and to secure equitable relief under any act of Congress providing for protection of Civil Rights.  It has been stated that Section 2 of the Voting Rights Act of 1965, 42 U.S.C. Section 10301, as amended, prohibits any and all practice[s] that has the intent or the result of denying a citizen of the United States the right to vote on account of race, color, or status as a language minority.  Section 2 states in pertinent part:

    (a) no voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any state [North Carolina] or political subdivision [Trenton] in a manner which results in a denial or abridgement of the right of any citizen of the United States [pro se plaintiff and all others similarly situated] to vote on account of race or color [who are African-Americans], or in contravention of the guarantees set forth in Section 4 (f) (2), as provided in subsection (b).

    (b) a violation of subsection (a) was established when the defendants, herein, acted shown that the political process leading to nomination or election in the State [North Carolina] or political subdivisions, the Jones County Board of Elections and the North Carolina State Board of Elections, are not equally open to participation by the pro se litigant, herein, and all others similarly situated voters, who are members of a class of citizens protected by subsection (a) in that its members, plaintiff, and all other members of the electorate to participate in the political process and to elect preferred representatives of their choice.

13. Plaintiff states that in 1965, Congress passed the Voting Rights Act, and was intentionally intended to make the "right to vote" for any and all persons a reality. Further, plaintiff and all others similarly situated, filed this complaint against the Jones County Board of Elections and the North Carolina State Board of Elections, et al., [and their officials], in violation of Section 2 of the Voting Rights Act, for African-Americans have never, ever, had an African-American of their choice elected or appointed to the Town of Trenton's Council [as Aldermen].  Additionally, Section 2, continues to protect

minority communities of all sizes, including the Town of Trenton, and all subdivisions, from purposeful discrimination, "at least in theory." Yet, Section 2 prohibits local governments, such as the Town of Trenton, and the Jones County Board of Elections and the North Carolina State Board of Elections [defendants herein] from adopting practices, procedures that dilute the plaintiff's voting strength, as complained of, in "past and present" actions.

14. Whereas, the Town of Trenton and the Jones County Board of Elections received an initiative petition pursuant to G.S. 160 A on August 14, 2014, proposing amendments to the charter of the town as set forth in Chapter 174 of 1911 Private Laws of North Carolina as amended, "to no avail." The town's at-large [effect] method of electing the Town Council [Aldermen], its Mayor, violates Section 2 "and" Section 2 does not require plaintiffs to produce evidence of intentional intended "discrimination." Section 2 of the Voting Rights Act is appropriate enforcement legislation under the Fourteenth [14th] and Fifteenth [15th] Amendments to the United States Constitution. Plaintiff is challenging, in its entirety, the District Court's finding of liability of the Jones County Board of Elections and the North Carolina State Board of Elections, who are proper defendants in this case.

15. In every motion filed by the pro se litigant in any and all previous actions [filed December 28, 2009] plaintiff filed a motion for leave to file a new complaint along with a motion proceed in forma pauperis, "to no avail." In any and all previous filed claims the District Court [Judge M.J. Howard] rejected each and all of them [from 1999 – 2019] and considered all motions, as to all cases, "as moot," pursuant to Rule 41 (a) of the Federal Rules of Civil Procedure, the matters were hereby dismissed. In North Carolina had 52 successful Section 2 Cases and as further appears from the long, long legislative history, decisions since 1982 have found numerous and ongoing examples of intentional intended discrimination at the state and local levels. Renewing the temporary provisions of the Voting Rights Act: Legislative options after LULAC v Perry, 109th Cong. 2d Sess, at 372 [filed on July 13, 2006] [legislative options] Congress concluded that the need for Section 5 was evident from "the continued filing of Section 2 Cases that originated in covered jurisdictions," many of which resulted in findings of intentional intended discrimination. 120 Stat 577 Sec 2 (b) (4) and (5). The disproportionate number of successful Section 2 suits in covered jurisdictions is even more significant given that Section 5 blocks and deters discrimination In the covered jurisdictions, and one would expect to see fewer Section 2 Cases there.

16. Tennessee v Lane, 541 U S at 524 – 25 nn. 6 – 9 & 13, for example, the court relied upon evidence consisting of articles and cases published ten [10] or more years after the act's enactment, as well as recent versions of statutes and regulations, in upholding the constitutionality of Title II of the Americans with Disabilities Act of 1990. The Court of Appeals in this case properly relied upon Tennessee v Lane in taking into account the

report prepared by Dr. McCrary of unpublished cases in non-covered jurisdictions because it "corroborates the disparities in the level of discrimination between covered and non-covered jurisdictions revealed by this data.

17. Plaintiff, as "[A]n individual will bring this suit for declaratory judgment and injunctive relief, claiming that the Jones County Board of Elections, and the North Carolina State Board of Elections, and their officers, et al., requirement is covered by Section 2, but has not been subjected to the required federal scrutiny." See, Allen v State Board of Elections, 393 U S 544, 561 [1969]. The court should conclude and hold that the statute to require such a suit to be heard by a three [3] judge court. therefore, the claim concerning the change from at-large [effect] election method of election of wards to districts [2 districts each] should be added by amendment.

18. Plaintiff alleges that Section 2 does not on its face provide a private right of action, nor does it say who may sue to enforce the statute. The court has held, however, that "although Section 2......provides no rights to use on its face, "the existence of the private right of action under Section 2......has been clearly intended by Congress since 1965." See, Morse v Republican Party of Virginia, 517 U S 186, 232 (1996). Similarly, Section 2 while it defines conduct that is unlawful for a state or political subdivision to engage in, does not specify who might be a proper defendant who was not given as to benefit but as such determination is made by reference to state and federal law. [However, "Section 1983 include the Town Council, and its Mayor, Jones County Board of Elections, and the North Carolina State Board of Elections, and its officers, et al., while in conspiracy and acting under color of law in their representative capacities as well as their individual capacities, within the meaning of person' as the term is used in Section 1983 for the equitable relief sought here].

19. The defendants' actions complained of herein while in conspiracy and acting under color of law of the State of North Carolina. The policy underlying at-large [effect] method of elections for the Town of Trenton, its Council [Aldermen], and its Mayor, and the Jones County Board of Elections, and the North Carolina State Board of Elections, and their officers, et. al., is tenuous. The plaintiff, and all others similarly situated desires to participate, fully, in the electoral and political processes of the Town of Trenton, North Carolina, on an equal basis with "White" Residents.

20. Plaintiff alleges that the at-large [effect] method of elections now in force or effect, past and present, come within Section 2 of the Voting Rights Act of 1965, which do affect plaintiff, and all others similarly situated voters' abilities to vote and do have a racially discriminatory purpose or effect, "which did not deny out of benevolence but malice." The change [requested] towards [districts and minorities being elected to the Town

Board] from an at-large method of elections for Town Councilmen [Aldermen] comes within the preview of Section 2 of the Voting Rights Act of 1965, since the procedure in fact "in force or effect." Plaintiff filed this motion to adopt a resolution of intent, GS 160 A 102, forthwith, requesting a change towards [for the betterment of all], where this court would, should, or could hold explicit "[t]he only issue is whether a particular town [Trenton] enactment is subject to the provisions of the Voting Rights Act, and all federal scrutiny.

21. The discrimination by the Jones County Board of Elections, and the North Carolina State Board of Elections, defendants herein, is not a private matter but amounts to unconstitutional state action. African-American Voters to participate in the political process and elect preferred candidates of their choice. Even where the right to register and vote is freely available, the African-Americans' voting strength was diluted in a variety of ways as follows: Title 42 U.S.C. Section 2000-b (a), to enforce rights, and/or, political rights, guaranteed to the plaintiff, by the Equal Protection Clause of the Fourteenth [14th] and Fifteenth [15th] Amendments to the United States Constitution, and 42 U.S.C. Section 1971, which did deprive plaintiff of other Civil Rights where privileges, immunities, and all other state and federal constitutional provisions [right to vote] which was not applied equally, and has a continuing effect, offense [basis] in violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. Section 2000d and 7 C.F.R. Section 15.3; plaintiff files this complaint under Article II, Section 6 and 7 and Article VI of the Constitution of the State of North Carolina, whereas, plaintiff seeks damages of $15,000,000,.00 and to secure equitable relief under any act of Congress providing for protection of Civil Rights. Because of the at-large [effect] method of elections and polarized [effect] voting, plaintiff and all others similarly situated have been discouraged from running for the Trenton Town Council, and its Mayor, plaintiff and other minorities have less [none] opportunity than White Residents to succeed.

22. Plaintiff filed this motion to vote under Section 2 of the Voting Rights Act of 1965, and a further request for two [2] districts for each race, herein; these restrictive barriers, did ask for the Town of Trenton to be divided, in two [2] African-American and two [2] White by petition G.S. 160-A-101, filed July 10, 2013, and should have been added by amendment, complained of herein before, prevented the plaintiff, and all others similarly situated voters, from exercising their most fundamental Civil Rights, "the right to vote under Section of the Voting Rights Act of 1965." Plaintiff, Daniel J. Willis, herein, alleges that this is an action for declaratory and injunctive relief against any and all discrimination in voting by the defendants, et. al., herein, and to specifically perform all the conditions entered into pursuant to enforce the provisions of the 13th, 14th, 15th, 19th, 23rd, 24th, and 26th Amendments to United States Constitution and Section 2 of the Voting Rights Act of 1965, and 42 U.S.C. Section 10301.

23. To establish racially polarized voting it has been determined, by filing this complaint that the minority voters tend to vote for the same particular preferred candidate[s] [minority voters are cohesive] and the White Voters tend to vote against the preferred candidate[s] of choice; additionally, Section 2 continues to protect minority communities of all sizes from purposeful discrimination, except, "the Town of Trenton, North Carolina."

24. Plaintiff alleges that the defendants, again, have had an unconstitutional, long, long, long history of discrimination [at-large [effect] method of elections], which the plaintiff did request the Federal District Court [under Judge M.J. Howard, retired] for preventive relief to protect plaintiff's right to vote under Section 2 of the Voting Rights Act of 1965. See, 42 U.S.C. Section 10301 et seg. Also, City of Rome v U.S., 446 U S 156, 100 S Ct 1548, 64 L Ed 2d 119, where the defendants are proper defendants in this case. The reason for defendants' failure to conform its 2020 election to state law, as required by Section 2 of the Voting Rights Act of 1965, does "not" appear in the record. Even in oral argument, town and Jones County Board of Elections, and the North Carolina State Board of Elections, and their officials, et al., while in conspiracy and acting under color of law, altogether, "failed" to state that the lapse was due to their overlooking the state law, " which did not deny out of benevolence but malice."

25. Plaintiff states that long, long, long history of "White" domination [as it appears] in the Town of Trenton [about 300 years or more] has been one of adaptiveness, and if the passage of the district voting occur, as requested, and the increased African-American registration that will follow and will result in new methods to maintain "White" control of the political process. It is alleged that such actions could be found to violate Section 2.

26. Plaintiff states that there is a dilution of plaintiff, and all others similarly situated voters, voters strength, which is governed by the legal principles set forth in the case of Thornburg v Gingles. Plaintiff will show unto this court, to the jury, to demonstrate a violation under Section 2, as follows:
   (a) that a minority group is sufficiently large and geographically concentrated to make up a majority in a single – member district;
   (b) that the minority group is politically cohesive – that is, it usually votes for the same preferred candidate[s]; and
   [c] that, in the absence of special circumstances, the "White" Majority Votes altogether to defeat, and do defeat, the minority's preferred candidate[s].
If the minority groups can establish those three [3] things [known as precondition], the Supreme Court has said that the next question is whether, under "the totality of the circumstances," the minority group had less opportunity than other members of the electorate to participate in the electoral process and to elect representatives of its

choice. Further, it is believed, that Section2 of the Voting Rights Act can [should, could, and would] be used either to advocate for or to litigate to obtain a more reasonable and fairly drawn plan better reflects the voting strength of minority votes in this particular area.

27. Plaintiff respectfully request the court to vigorously debate the issues to a constitutional, voting and Civil Rights end. Given the remedy and facts [where evidence was required, See, Exhibit No. 9990, second denial] of this case, plaintiff is entitled to relief. Section 2 was designed to provide a comprehensive constitutional and statutory rights. Thus, the court was in error for asking the plaintiff to produce evidence. Allegations far less specific than the ones in the complaint before this court have been held adequate to show that the matter [concerning evidence] was not privileges to this District Court, where the matter in controversy arose under the Constitution of the United States. See, Wiley v Sinkler, 179 U. S. 58, 64 – 65, also, Swafford v Templeton, 185 U.S. 487, 491 – 492.

28. Plaintiff and all others similarly situated, located in Trenton, and areas contiguous to the Town of Trenton, where the town passed an ordinance, October 10, 1949, denying African-Americans and people of color a [right] to live in Trenton [See, Exhibit # A appended hereto], and unto this very day, African-Americans, people of color, and all others similarly situated, are denied sewage services being connected to the Trenton Sewage Plant, and where annexation is denied [in its entirety] in sufficiently numerous and geographically compact, where no person of color has never, ever been elected to the Town Board, as Aldermen, although, Trenton is the County Seat, and that would constitute a majority in one [1] or more single-member districts for the election of members of the Town Council, and Mayor.

29. Plaintiff asks that the court to remove Town Alderman, Charles C. Jones, Jr., [See, Exhibit #911, appended hereto],and Town Clerk, Glen Spivey from the Town Council, who has always "failed and refused" to listen to African-Americans, people of color, and all others similarly situated in said areas which are politically cohesive in that they tend to vote as a bloc and have organized themselves collectively for political activity and do have common socio-economic characteristics, and a common and distinct history and heritage [See, Exhibit # 89 appended hereto]. Whereas, plaintiff asks this court to enjoin defendants from failing to conduct elections for the Town Council, its Mayor, in a timely fashion pursuant to a redistricting plan that complies with Section 2 of the Voting Rights Act and the Constitution of the United States.

30. Plaintiff asks this court to retain jurisdiction of this action and grant plaintiff any further relief, as to plaintiff's previous requests for relief stated in past and present, actions, which may in the discretion of this court be necessary and proper to ensure that timely and lawful procedures are used in elections, and all other [requests] cases. Also, award

plaintiff cost of this action, together, in their official and individual capacities, and their reasonable attorneys' fees, and damages of $15,000,000.00, pursuant to 42 U.S.C. Section 10301, and whereas, the defendants are with personal knowledge of the allegations in this complaint and therefore should approve them. The defendants are not immune from any claims for monetary relief.

31. Moreover, the defendants do not object to and do not deny the contents of certain exhibits appended to the complaint which were reference in the text of the complaint, and the defendants should, also, admit its official actions taken were illegal.

32. The defendants are with knowledge of the "desires" of the plaintiff, and all others similarly situated, and therefore, should approve the allegations, herein, including the "true" implication that the electoral and political process through which one gains election to the Town Council, and to reopen the side-walks, curbs, gutters, and storm drainages, and the connection of public municipal sewage services be connected to the [new] Trenton Sewage Plant, which are not open equally to the plaintiff and all others similarly situated African-Americans, voters and residents.

33. Paragraph one [1] do constitute a factual allegation, and where a contention description of the relief sought by plaintiff, and all others similarly situated citizens which require an affirmative admission or denial.

34. Plaintiff, and all others similarly situated citizens do ask the court to rule and hold that this complaint is not deficient and is not subject to dismissal due to any failure on the part of the plaintiffs, through no fault of their own, where allegations of voter fraud has been alleged, and do state that the Town of Trenton has no minority businesses [what so ever] in the town limits of Trenton, no sidewalks, curbs, gutters, or storm drainages, partly annexation, no people of color on Town Board, one [1] minority on Sheriff Department, one [1] minority on Water Department, no water hookups from 1990 – unto this very day [as to sewage] in minority areas, contiguous and adjacent to the town, no minorities employed by the town, minorities do not have use of the [2018] sewage plant, no minorities buried in Town Cemetery, no grants or loans for minority neighborhoods or communities [except Whites], minorities catch "pure" hell that reside in the Town of Trenton where discrimination complaints were filed with the United States Department of Justice since 1990 that predominantly minority neighborhoods (outside of the town limits) are denied said services.

35. A "profound moral and constitutional challenge" for the Jones County Board of Elections, et. al., is to remedy the "at-large election [effect] methods," and the long, long history of lingering effects of racial discrimination. And the "plaintiff, acting

through democratic and representative processes" of the United States Government, "has concluded time and time again that serious remedial efforts sometimes require, as in Case No. 4:20-CV-230-FL, race conscious programs.

36. Plaintiff alleges that race conscious programs, herein, enable the plaintiff to enter various areas, such as voting, employment, and/or, education, for example – from which the plaintiff, minorities, and all others similarly situated have been excluded previously through discrimination. Such measures were attempts to ensure that all Americans, including the plaintiff, and all others similarly situated are treated as equal citizens and to achieve equal opportunity that is truly open to all.

37. Plaintiff filed this complaint for this is an important part of overcoming the at-large election [effort] methods, enforced by the defendants, herein, and the past and present practice of discrimination and exclusion, it is not enough. Eliminating the law will often maintain the status quo. As plaintiff noted on a number of occasions, the court cannot undo the legacy of race discrimination simply by repealing laws. Race must be taken into account affirmatively, in order to overcome racism.

38. Plaintiff alleges that in addition, after carefully considering other race neutral alternatives, Congress found the race conscious measure actually adopted to be the most effective in promoting and protecting diversity in our society, as for example in the [past] broadcasting industry. Because the industry "was" owned and controlled almost exclusively by White Males, the court found a lack of diversity, which Congress has, or had, a legitimate interest in correcting.

39. Plaintiff alleges that in many areas where is, or was invidious racial discrimination nameiy, Town of Trenton, North Carolina, after a _long, long, long_ history of discrimination, plaintiff, minorities, people of color, and all others similarly situated remain significantly underrepresented and face disproportionately difficult challenges in achieving, "_at-large in theory,_" or success. Affirmative action means that qualified minority persons must be recruited and fully considered for representing the town, as Town Aldermen, and for any and all other employment and promotion, where the at-large election [effect] methods denies such in its entirety, which are not only discriminatory.

40. Plaintiff alleges that the Supreme Court has held that the desire to achieve racial diversity in certain public forms, namely, the Town of Trenton, is important enough to be the sole constitutional basis for at-large election [effect], past and present, methods and race conscious preference policies enacted by Congress. Plaintiff states that in broad terms, a race conscious program can be any program where race is a deliberate

consideration in design, namely, the at-large election [effect] methods, past and present, where its implementation, or purpose of the program. Under this definition, a program to exclude the plaintiff, people of color, minorities, and all others similarly situated because of race, as well as a program to include minorities, would be a race conscious program. And because nomination in the primary was tantamount to election to office in the Town of Trenton, as aldermen, and others, that used the all White primary, the plaintiff, minorities, people of color, and all others similarly situated, even those who were registered, were effectively shut out from the elective process of the at-large election [effect] methods, past and present.

41. Plaintiff alleges that the at-large Voting Rights Act, past and present, as we shall see, was never, ever a further deterrent to such racial gerrymanders since covered jurisdictions seeking to change voting lines now have the burden under Section 5 of the act to prove the absence of a discriminatory purpose or effect. The purpose of the programs is to remove minorities from the voter roles or discourage or intimidate them from voting and electing a candidate of choice.

42. Plaintiff alleges that minority vote dilution, as distinguished from vote denial, as in said case, is the impairment of the equal opportunity of the plaintiff, people of color, minorities, and all others similarly situated voters to participate in a political process and to elect candidates of our choice. Even where the right to register and vote is freely available, the plaintiffs, and all other similarly situated voting strength was impaired, and diluted, in a variety of ways, including through use of such procedures as at-large elections [effect] methods, now being enforced, [by the defendants, et. al.], past and present, and by racially gerrymandered reapportionment plans that unnecessarily fragment [crack], submerge [stack], or concentrate [pack] the plaintiff and other minority population, through use of numbered posts, staggered terms of office and majority vote requirements, and/or, by laws prohibiting single shot voting, and by discriminatory annexations and the abolition of elected or appointed offices.

43. Plaintiff alleges that when the enforced at-large election [effect] voting methods, past and present, is at-large, all the voters in a jurisdiction elect all the officials. The majority, if it votes as bloc, can choose, and do choose, all the office holders in the Town of Trenton, North Carolina, thereby depriving a discrete minority of an effective opportunity to elect any representatives of its choice. As stated herein before, at-large elections are a "winner take all" system that favors the numerical majority. The court enjoined the attempted purging of minority voters as being in violation of the Fifteenth [15th] Amendment.

44. Plaintiff, further alleges, in his conclusion, that the at-large elections, past and present, numbered posts, staggered terms, majority vote requirements and all other voting

procedures that can, and do, dilute minority voting strength automatically unconstitutional where these procedures are not unconstitutional per se, but their use is unlawful where they were adopted purposefully [as in the Town of Trenton] to discriminate or where, in the context of the facts of a given jurisdiction, they [do] interact with social and long, long, long historical conditions to cause, and do cause, an inequality in the opportunities enjoyed by African-American and White Voters to elect their preferred candidates.

45. Finally, plaintiff alleges that in its first decision invalidating an at-large election system because it diluted the plaintiff and minority's voting strength. See, White v Regester, [decided in 1973], the Supreme Court applied a "totality of circumstances" analysis. The court considered, aside from the fact that few [if any] minorities had been elected to the Trenton Town Board as aldermen, where a broad range of factors affecting the plaintiff and all other minority political participation: (1) a long, long, long history of discrimination; (2) the existence of racially exclusive slating groups; (3) cultural and language barriers; (4) depressed minority voter registration; (5) lack or responsiveness by elected officials to the needs of the plaintiff and the minority community; and (6) the use of election devices, such as numbered posts and majority vote requirements. Based upon the "totality of the circumstances" this court could, would, and should conclude that the plaintiff and all other minorities" had less opportunity than did other residents in the district to participate in the political process and to elect legislators of their choice." The White v Regester analysis which examined the effect of all challenged practice to determine its constitutionality, was routinely applied in subsequent voting cases.

46. Plaintiff alleges that Congress was unhappy with the subjective intent standard of Bolden, therefore, Congress amended the Voting Rights Act in 1982 to provide that a violation of Section 2 of the act, as opposed to the Constitution could be established by showing either the discriminatory purpose or result of a challenged practice. Congress rejected exclusive reliance upon the intent standard for three [3] basic reasons: (1) it was unnessarily devisive" because it required the plaintiff and other minorities to prove that local officials were racists, the burden of proof was "inordinately difficult," and it "ask[ed] the wrong question." The "right question" was whether the plaintiff, and/or, other minorities had an equal opportunity to participate in the political process and elect candidates of their choice. Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts. The effect of Lodge was to restore the constitutional tests for vote dilution contained in White v Regester.

47. In response to an increasing popular demand for equal rights, Congress enacted major Civil Rights legislation during the 1900s. these modern statutes protect racial minorities against most forms of public and private discrimination in employment, public

accommodation, programs supported by federal dollars, education, voting, and the administration of civil and criminal laws.

48. Our constitutional and legislative systems provide the means to ensure equality to eradicate the continuing effects of past discrimination accumulated over more than two hundred and fifty [250] years. But laws do not enforce themselves. The challenge to all of us is to make the laws work, to ensure that the principle that all persons are created equal becomes a reality.

49. WHEREFORE,
The Fifteenth Amendment prohibits purposeful discrimination in voting at all levels of the political process by federal, state, and local officials [defendants herein] on the basis of race, color, or previous condition of servitude, and where discrimination by a political party is not just a private matter but amounts to unconstitutional state action, "where the Supreme Court has held."

50. The Amendment of Section 2 accelerated the pace of voting rights litigation. It has brought about a general decline in at-large elections and an increased use of district voting, Congress considered such arguments when it amended Section 2, and rejected the at-large election [effect] method of voting as unfounded. Several court decisions have held that there is a constitutional right to receive assistance in voting.

51. In closing, plaintiff alleges, that in addition to new, racially fair election procedures, successful plaintiffs in Section 2 Cases are entitled to special elections, orders ending the 1awarded fees as a matter of course whereas, prevailing defendants may recover fees only if the law suit was frivolous. See, 42 U.S.C. Section 2000e-5(g), and 42 U.S.C. Section 2000e-(k).

## JURISDICTION

Plaintiff invokes the jurisdiction of this court 28 U.S.C. Section 1331, 1343 (a) (3) and (4) and 2201, this suit is being authorized by 42 U.S.C. Section 10301. Venue is proper in this district under 28 U.S.C. Section 1391 (b).

## EQUITABLE RELIEF

A real and actual controversy exists between the parties. Plaintiff has no adequate remedy at law other than this action for declaratory and injunctive relief. Plaintiff is suffering irreparable injury as a result of the violations complained of herein and that injury will continue unless declared unlawful and enjoined by this court.

WHEREFORE, plaintiff respectfully prays this court:

1. Take jurisdiction of this case
2. Enter a declaratory judgment that the existing method of electing the Trenton Town Council, its Mayor, violated Section 2 of the Voting Rights
3. Plaintiff asks that this case be heard by a jury [See, cover sheet].
4. Plaintiff asks the court to fulfill all requests made by the plaintiffs in their entirety
5. Plaintiff and all others similarly situated voters do request damages and to secure equitable relief under any act of Congress providing for protection of Civil Rights.
6. Enjoin defendants from failing to conduct elections for the Town Council, its Mayor, in a timely fashion pursuant to a redistricting plan that complies with Section 2 of the Voting Rights Act and the Constitution of the United States
7. In the event defendants fail or are unable to conduct elections for the Town of Trenton, its Mayor, in a timely fashion pursuant to a redistricting plan that complies with Section 2 of the Voting Rights Act and the Constitution of the United States, implement a Court Order redistricting plan and schedule of elections
8. Retain jurisdiction of this action and grant plaintiff any further relief, as to plaintiff's previous request for relief stated hereinbefore, which may in the discretion of this court be necessary and proper to ensure that timely and lawful procedures are used in elections for the Town Council and its Mayor, and all other requests
9. Award plaintiffs the cost of this action altogether in their official and individual capacities, and their reasonable attorneys' fees and $15,000,000.00 in damages pursuant to 42 U.S.C. Section 10301
10. Award plaintiffs four [4] districts, two [2] districts White only, and two [2] districts minority only.

See, Exhibits appended hereto previously, past and present cases. Also, Case No. 4:19-MC-1-H filed Jun 17, 2019.

Daniel J. Willis
105 Cherry Street
Trenton, N.C. 28585
(252)448-6091
e-mail: danj5997@gmail.com
Pro Se Plaintiff
      And
NAACP Chairman Legal Redress Branch 5409