**REPEAL AT-LARGE ELECTION**

**AMENDED COMPLAINT – RULE 15**

**CASE NO. 4:20-CV-230-FL**

**FEBRUARY 10, 2021**



FILED
FEB 1 0 2021
PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

1. Plaintiff alleges that elected officials chosen by the voters of the state as a whole rather than from separate congressional or legislative districts according to law; and election at-large is an election in which a public official is selected from a major election district rather than a minor sub-division within the larger unit.

2. Yet, the defendants, herein, "have acted, through the many years, with ferocious spotty results," and have allegedly acted in conspiracy, while acting under color of law, where said acts were willfully, wrongfully enforced, where the at-large election [effort] methods and vote dilution as to deprive the plaintiff, minorities, people of color, and all others similarly situated of their pre-existing rights as to Equal Protection and Due Process Clauses, and vote dilution [where no preferred minority candidate of choice has never, ever been elected or appointed to the Trenton Town Council as Aldermen], and where the Town Council, now being enforced by the at-large [effort] method of election now being held in the Town of Trenton, County Seat of Jones County, and where the prevention and redress of wrongs were enacted or being maintained with a racially discriminatory purpose.

3. Here, the at-large election [report] is made to the Board of Elections [of the number of votes cast for each candidate], with the duty of counting or tallying the votes for "Whites," and against "minorities" [who no longer participate in the at-large elections], suffers not a recall as to intent shown. Once more and again plaintiff alleges that election at-large as enforced in Trenton] is an election in which a public official is selected [by Whites] from an election in which a public official is selected [by Whites] from a major election district rather than a "minority" from a minor sub-division within the larger unit, based on race, color, and national servitude. Further, it is alleged that the Fifteenth [15th] Amendment prohibits willful, purposeful discrimination in voting [at-large elections] at all levels of the political process by federal, state, and local officials of the Town of Trenton, on the basis of race, color, or previous conditions of servitude.

4. Plaintiff alleges that the consequence of the lack of enforcement of the Fifteenth [15th] Amendment, predictably, the consequence was the disfranchisement of African-Americans, people of color, minorities, and all others similarly situated, that is, parties in the past, present, and future were deprived of the right to vote for their preferred

candidate of choice, in the Town of Trenton [county seat], Jones County, North Carolina, and be elected or appointed to the Town Council, from its original beginning, "unto this very day."

5. After many, many years of willfully, willful despiteful intimidation and violence by Whites, African-Americans registered and voted in substantial numbers in states where the plaintiffs [minorities and people of color], had formerly been denied the ballot because of ordinances, for example [See Exhibit # 000 appended previously and hereto]. It's favorite way of excluding African-Americans, etc., from voting [and causing fear], adopted by the Town of Trenton, and by any and all southern states, herein, "was the literacy test." The test required a person to read and write a portion of the Constitution as a condition for registering. The literacy test was racially neutral on its face, but it was administered in a way that excluded African-Americans, etc., but not Whites, from voting.

6. Plaintiff alleges that in the history of Trenton, and its original beginning, there has <u>never, ever</u> been an African-American, person of color, elected or appointed to the Trenton Town Council; nor do African-Americans, people of color have <u>never, ever</u> seen a <u>sidewalk</u>, <u>curb</u>, <u>gutter</u> or <u>storm drainage</u> in their communities, and/or, neighborhoods, or have been completely annexed to the town, nor, can they "tie-in and use the [new] 2017 Sewage Plant, based on race, color and national servitude.

7. And of course plaintiff alleges that he - as to Summary Judgment, has <u>never, ever</u> filed a frivolous or malicious law suit. The District Court used said term "to add color to its phrase," which was false, and in a negligent, careless, and heedless manner [See, Exhibits 1 and 1A in appended hereto]. The federal government prohibited interference with voting in federal elections. It authorized the Attorney General [the chief law officer of the U. S.], to bring lawsuits to protect voting rights, and set out procedures for holding in criminal contempt, or punishing, those who disobey[ed] court orders ending the at-large election [method] discrimination by making them pay, fined, and/or, sentencing them to jail, where the at-large election is still being enforced by the defendants, herein, instead of 42 U S C A Section 10301.

8. Plaintiff further alleges that some of the reconstruction voting laws did survive; a statute protecting the right to vote without regard to race or color, and the two [2] laws making those who interfere[d] with protected rights for example, the right to vote, and/or, elect their preferred candidates of choice, liable for money damages in civil, or private, lawsuits brought by the party of discrimination, and two [2] statutes imposing criminal penalties [imprisonment or fines] on persons who hinder[ed] others in their attempts to vote for their preferred candidate[s] of choice. Even those surviving laws are limited in

their scope and until recently, were infrequently used. Some laws were used to prevent election fraud[s] but were rarely used to protect against racial discrimination in the at-large election method now being enforced in the exercise of the right to vote. Other laws were used in banning, any and all, White Primaries but seldom to attack, if any, other forms of discrimination in voting in an at-large election method.

9. Plaintiff respectfully prays upon the court to grant the plaintiff such further relief as maybe appropriate[d] under color of law, in order to form a more perfect union, while in their official capacities, is conferred by 28 U S C Section 1331 (a) and 1343 (3) and (4), 42 U S C Section 1983 (1982) et seq. 42 U S C Section 1985 (2) (3) (1982), 42 U S C Section 2000d, and its implementing regulation[s], at 34 C.F.R. Part 100, affords plaintiff the vehicle to redress violations of constitutional rights, in this Case [4:20-CV-230FL], as previously complained where a violation of the Fifth [5th] Thirteenth [13th], Fourteenth [14th] and Fifteenth [15th] Amendments to the United States Constitution, and all other constitutional provisions, where such rights have been violated by "public elected officials," acting in their official capacities under "color of law." Title VI of the Civil Rights Act of 1964 and 1991, as amended, Fed R Civ P Rule 17 (b) (1), where plaintiff institutionalized this said action previously, and as to pain and suffering which is hidden. The weight of voting for their preferred candidate[s] of choice as to at-large election[s], and where plaintiff's need is the greatest power, degree, or effort [vindictive and imputed trial that reflect[s] the priority of the people], and is short on attention and long on amnesia.

10. Wherefore, the hereinabove and hereinafter reasons plaintiff prays upon the court to dismiss defendants request for dismissal of said action, and this case is where racial [lawlessness] discrimination would, could, and should retire, and which prohibits official discrimination, statutes, implementing the Thirteen [13th], Fourteenth [14th], and Fifteenth [15th] Amendments and imposing civil penalties upon those who interfere with access and use of past, present, and future public accommodations.

11. Here, the problem of "excluding" African-Americans, et. al., in question, be entirely addressed, by the District Court, who has failed and refused to recognize Case # 4:10-MC-1, 4:10-MC-2, and 4:10-MC-4 [and others] from 1995 – 2020, to no avail, where the denial of voting is where the problem of the twenty first [21st] century is the "color line."

12. At – the time the challenged districting plan, and the removable of the at-large [method] elections were never, ever enacted where following circumstances affected the plan's effect upon voting strength and the removable of the at-large [method] election[s] associated with African-Americans, et. al., adjacent and in the Town of Trenton [the plaintiff's class], and particularly those in the areas of the challenged districts. These govern proceedings under the judicial conduct and Disability [Act] Act,

28 U.S.C. Sections 351 – 364, to determine whether a covered [Judge Malcolm Jones Howard] judge has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts from 1995 – 2020, without a single case being heard by a judge, and/or, jury, after filing said complaints against the defendants and local dignitaries to the courts or is unable to discharge the duties of office because of mental or physical disability.

13. Here, the covered Judge [Malcolm Jones Howard], a covered judge is defined under the act and is limited to judges of the United States Court of Appeals, Judges of United States District Courts, Judges of United States Bankruptcy Courts, United States Magistrate Judges, and Judges of the courts, specified in 28 U.S.C. Section 363, where plaintiff has filed these said complaints, many, many times, "to no avail." With regard to all complaints and petitions filed for review, Rule 27 [C] grants the petitioner unrestricted authority to withdraw the petitions. It is thought that the plaintiff's interest in the proceeding[s] have been a decision by the Chief Judge and often by the judicial council as well in such a case[s], and where the plaintiff prays upon the court to keep its focus on the outlawed, discontinued at-large [method] of elections, now being enforced by the defendants.

14. Plaintiff alleges that other voting procedures that lessen the opportunity of African-American Voters to elect their preferred candidates of choice, to the Trenton Town Council, in addition to the numbered seat requirement and the anti-single shot provisions of state law [at-large elections] held in Trenton [Jones County – County Seat] were declared constitutional from the beginning unto this present moment, the defendants have, since 1915, had a majority vote requirement which applies to all primary elections, but not the general elections. N.C.G.S. Section 163 – 111. This generally adverse effect on any cohesive voting minority [African-Americans] is of course, enhanced for racial minority groups if, as pro se litigant found to be the fact in these cases, where racial polarization in voting patterns also exists.

15. While no African-American [minority] candidate for election, in the at-large [method] election to the North Carolina General Assembly – either in the challenged districts or else where – has so far lost [or failed to win] an election, simply and solely, because of the majority vote requirement, the requirement nevertheless exists as a continuing practical impediment to the opportunity of African-American voting minorities in the challenged districts to elect their preferred candidates of their choice.

16. Further, plaintiff alleges that however, Section 2 claimants are not required to demonstrate by direct evidence a causal nexus between their relatively depressed socio – economic status and a lessing of their opportunity to participate effectively in the

political process. See, S. Rep No. 97 – 417. Supra Note 10, at n. 114, under incorporated White v Regester jurisprudence, "[i]nequality of access is an inference which flows from the existence of economic and educational inequalities." See, Kirksey v Board of Supervisors, 554 F 2d 139, 145, [5th Cir.], cert denied, 434 U S 968, 98 S Ct 512, 54 L Ed 2d 454 (1977). Independently of any such general presumption incorporated in amended Section 2, pro se litigant could, should, and would readily draw the inference from the evidence in these cases.

17. The use of racial appeals in political campaigns is from the reconstruction era to the present time, appeals to racial prejudice against African-American Citizens have been effectively used by persons, defendants, either candidates or their supporters, as a means of influencing voters in, and adjacent to the Town of Trenton in political campaigns. The appeals have been overt and blatant at some times, more subtle and furtive at others. They have tended to be most overt and blatant in these periods when African-Americans were openly asserting political and Civil Rights – during the Reconstruction Fusion Era and during the era of the major Civil Rights Movements in the 1950's and 1960's. during the period from ca. 1900 to ca. 1948 when African-American Citizens of the town and adjacent areas were generally fuiescent under de jure segregation and when there were few African-American Voters and no African-American elected, and/or, appointed as officials, racial appeals in political campaigning were, simply and solely, not relevant and accordingly were not used, with the early stirrings of what became the Civil Rights Movement in the campaigns of the Town of Trenton, North Carolina, candidates. Though by and large less gross and virulent than were those of the outright White Supremacy Campaigns of 50 years earlier, time:

## CONCLUSION

WHEREFORE, pro se litigant alleges that "he is therefore entitled...... to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf, and finally to be given the benefit of all favorable legal theories invoked by evidence so considered." Plaintiff will not struggle to find witnesses to support his case.

Respectfully submitted,

Daniel J. Willis
Pro Se Litigant